UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WILMA CLARK

    PLAINTIFF

-AGAINST

CITY OF NEW YORK,
NEW YORK CITY POLICE DEPARTMENT
POLICE OFFICER IOCCO,
POLICE OFFICER DEL VILLAR,
BEST WESTERN HOTEL

    DEFENDANTS

AMENDED VERIFIED COMPLAINT

JURY DEMAND

Plaintiff, Wilma Clark, through her attorney Tamara Harris, Esq., complains and alleges as follows:

## THE PARTIES

1. Plaintiff, Wilma Clark, resides at 10602 227th Street, Queens Village, New York.

2. Defendants New York City Police Department, Police Officer Iocco (Badge # 6014) and Police Officer Del Villar (Badge # 20784) maintain a principal place of business at 1 Police Plaza, New York, New York.

3. Defendant Best Western Hotel is located in Queens County on the Van Wyck Expressway.

4. The City of New York maintains a principal address at the Office of Corporation Counsel, 100 Church Street, New York, New York 10007.

## JURISDICTION AND VENUE

5. This is an action arising under the laws of the State of New York. This court has jurisdiction over the subject matter of this action under 28 U.S.C 1331,

there being a federal question. Venue is proper in this district under 28 U.S.C. section 1391(b). Notice of claim against the above mentioned defendants was filed within 90 days of the accrual of this cause of action, pursuant to Section 10 of the Court of Claims Act and Section 50-I of the General Municipal Law.

### FIRST CAUSE OF ACTION- 42 U.S.C.S § 1983

MALICIOUS PROSECUTION, FALSE ARREST AND UNLAWFUL SEARCH AND SEIZURE OF PLAINTIFF BY LAW ENFORCEMENT OFFICIALS IN VIOLATION OF PLAINTIFF'S FOURTH AMENDMENT RIGHT; CRUEL AND UNUSUAL TREATMENT UNDER THE EIGHT AMENDMENT; AND VIOLATION OF PLAINTIFF' FOURTEENTH AMENDMENT LIBERTY RIGHTS, PROTECTED UNDER 42 U.S.C.S SECTION 1983

6.  On or about January 10, 2012 plaintiff, Wilma Clark, purchased and paid for an eleven day stay at a room at Best Western Hotel, in Queens County, for the benefit of her father and her brother.

7.  Best Western accepted Ms. Clark's money and plaintiff entered the hotel on January 12, 2012 to meet with her father and brother, who were occupying the room that Wilma Clark had paid for; to wit, room 301.

8.  Ms. Clark was scheduled to pick up her father in room 301 to take him to an appointment and found her sister, Rhonda Clark, in the room with him.

9.  Rhonda Clark was not registered as an occupant in the room that the plaintiff purchased.

10. Upon visiting room 301 plaintiff's sister, Rhonda Clark, who has multiple contacts with the criminal justice system and psychiatric history, began acting erratically and violently- compelling plaintiff to exit the hotel room.

11. However, plaintiff was forced to leave the room without her pocket book and demanded her sister, Rhonda Clark, return her pocket book and all the contents therein.

12. When plaintiff's sister refused the plaintiff called 911 and requested hotel personnel to do the same, seeking police intervention to help her retrieve her belongings.

13. When the police arrived plaintiff advised the police her sister had a criminal history and a psychiatric history, and was acting both violently and erratically within the hotel room that plaintiff had purchased. Plaintiff further advised the police that Rhonda Clark was refusing to return plaintiff's pocketbook.

14. Upon the police arriving, Rhonda Clark handed the officers Iocco and Del Villar plaintiff's pocket book from the hotel room door, at which time plaintiff emptied the contents of the bag onto the floor to make sure all of her belongings were inside and that nothing had been stolen.

15. Despite the fact that plaintiff had called 911 and had herself requested police intervention, Officers Del Villar and Iocco treated plaintiff like a perpetrator, and got very rough with Wilma Clark as she was checking to make sure the contents of her bag had not been removed or stolen.

16. Defendants Del Villar and Iocco grabbed the plaintiff's bag and then grabbed the plaintiff, who is a 62 year old African-American woman, before shoving her.

17. The Plaintiff immediately called 911 to report the misconduct of Officers Del Villar and Iocco for abusing the elderly plaintiff, in an attempt to get a sergeant who would control their violent behavior toward plaintiff and deter them from engaging in similar physical abuse of other members of the public. When plaintiff could not reach a sergeant she then requested Internal Affairs to report the above officer's actions against her and to address her concerns that they would abuse other members of the public.

18. Upon hearing plaintiff on the phone complaining of their conduct the above officers violently grabbed plaintiff and shoved plaintiff into an elevator, took her by force to the lobby and pushed plaintiff out of the hotel.

19. Upon exiting the hotel, plaintiff took down the names and badge numbers of Officers Del Villar and Iocco (Badge numbers 6014 and 20784) and told them she was going to make an official report documenting their misconduct. At that point the plaintiff had already exited out of the hotel entrance, when one defendant grabbed and yanked her hard.

20. The second defendant then tackled the plaintiff with great force and also roughly yanked her backwards across the lobby.

21. During the tackle, while both officers were on top of the plaintiff, one of them stated to the other to calm down, stating "cameras", at which point defendants falsely accused the plaintiff of trespassing, and called for back-up, alleging

plaintiff was an emotionally disturbed person who had to be taken to the psychiatric unit.

22. At no point in time did plaintiff resist the officers or engage in any criminal activity that would have warranted them to seize her or to use force.

23. Plaintiff, who was lawfully on the premises of the hotel that she had paid to occupy, and who was registered as the payor for room 301, was handcuffed by defendant officers Del Villar and Iocco and transported to Jamaica Hospital's Psychiatric Unit by the aforesaid defendants under the pretense she was a mentally disturbed person found trespassing at the above hotel.

24. After the above defendants delivered plaintiff in handcuffs to the psychiatric hospital, and an assessment was actually done on the plaintiff, she was released several hours thereafter.

25. The hospital found no basis to order the continued involuntary committal of the plaintiff, because, contrary to the defendant officers' false and malicious assertions, plaintiff was not an emotionally disturbed person.

26. Plaintiff was never charged with any crime by the aforesaid officers who accused her of trespass when they tackled her, detained her and transported her to the mental ward for what they hoped would result in a prolonged involuntary committal at Jamaica Hospital.

27. Plaintiff, who was held for many hours at the mental hospital before ultimately being released, was never prosecuted for any criminal behavior.

28. No reasonable person in the position of defendant officers would have believed plaintiff was either trespassing in the hotel, for which documentary evidence proved she had paid for.

29. No reasonable person in the position of the defendant officers would have believed plaintiff was a mentally disturbed person who had to be seized, tackled, handcuffed and transported to the mental hospital against her will and without her consent.

30. Plaintiff is a member of a protected class in that she is an elderly African American woman.

31. Defendants, Officers Del Villar and Iocco, are state actors acting under the color of state law, who violated recognized constitutional rights of the plaintiff; to wit, her 4th right to be free of unjustified seizures devoid of probable cause and malicious prosecution, and her 14th amendment liberty right; her first amendment right to engage in protected speech about a matter of public concern without suffering retaliation by law enforcement officials in the nature of a baseless arrest and involuntary transport to a mental institution; and her eighth amendment right to be free from cruel and unusual treatment of state actors, such as the right to be free from physical abuse by vengeful police officers acting out of malice.

32. The conduct of the aforementioned defendants violated a clearly established statutory right; to wit, 42 U.S.C.S Section 1983, and clearly established constitutional rights; to wit, Plaintiff's First, Fourteenth, Fourth, and Eight Amendment rights.

33. The conduct of the aforementioned defendants was objectively unreasonable, and a reasonable member of the NYPD would have known that it was unlawful to arrest an elderly woman and have her involuntarily committed to the psychiatric ward in order to get even with her for reporting police brutality.

34. The laws a) prohibiting state actors from effectuating unreasonable seizures, without probable cause, b) prohibiting state actors from engaging in cruel and unusual punishment, c) prohibiting state actors from engaging in malicious prosecution and d) prohibiting state actors from retaliating against persons for engaging in protected speech about matters of public concern are laws defined with reasonable clarity; they are recognized rights by the Supreme Court and the Second Circuit, and a reasonable defendant would have understood from the existing case law that his conduct was unlawful

35. Defendants actions constituted unreasonable conduct by state actors.

36. At the time of plaintiff's arrest, transport to the mental hospital and involuntary committal pending a mental evaluation- plaintiff was not engaged in any criminal behavior, had not resisted the police, and had acted in a reasonable manner by calling 911 to seek police intervention for her unruly sister.

37. Defendants knew they had no basis to arrest plaintiff or transport her to a mental facility and willfully and maliciously violated plaintiff's civil rights in order to retaliate against her for reporting their misconduct.

38. Plaintiff was arrested without probable cause or a shred of evidence that would lead a reasonable person in these officers' positions to believe the complainant had committed any criminal activity, especially since she had told them she had paid for the room in Best Western for which her sister was the only one trespassing.

39. Defendants Del Villar and Iocco's outrageous and malicious conduct in grabbing, shoving, tackling, arresting, and having plaintiff involuntarily committed to a mental hospital- in order to get even with her for reporting their misconduct- was cruel and unusual punishment.

40. Defendants actions caused plaintiff to suffer severe emotional distress, anguish, anxiety and physical pain.

## SECOND CAUSE OF ACTION- VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREE SPEECH UNDER 42 U.S.C.S § 1983

41. Plaintiff repeats and realleges all of the aforementioned accusations.

42. Plaintiff contacted the police department to report physical abuse by the above named defendants, Officers Del Villar And Iocco, to deter them from similar abuse against other members of the public and with the hope that a supervisor or Internal Affairs, would cause them to cease and desist from unwarranted abuse of plaintiff and others.

43. Plaintiff reported a matter of public concern, to wit; police brutality of an African American senior citizen and concern that such officers would engage in similar abuse against other elderly people and minorities of the public.

44. Plaintiff's call was induced by her desire to protect the public from the abusive tactics of two officers who were playing on the vulnerability of minorities and the elderly in society.

45. Plaintiff's report was of a matter of public concern; to wit, police brutality.

46. Plaintiff's speech was protected and was a direct cause of the illegal actions subsequently taken by Officers Del Villar and Iocco; to wit; their false arrest of plaintiff on pretextual charges of trespass and their involuntary committal of the obviously sane plaintiff- in retaliation for her speaking out about a matter of public concern; to wit, police brutality of minorities and the elderly.

47. Defendants actions were malicious and taken with the knowledge that the plaintiff had committed no crime, and that plaintiff was not mentally incompetent- such as to warrant her involuntary committal in a mental institution.

48. The defendants' actions caused injury to the plaintiff in that she suffered severe anguish, emotional distress, and physical pain.

THIRD CAUSE OF ACTION- BEST WESTERN HOTEL DENIED PLAINTIFF EQUAL RIGHTS IN A PLACE OF PUBLIC ACCOMODATION, IN VIOLATION OF N.Y. EXECUTIVE LAW §296(2) AND (9), AND DENIED PLAINTIFF THE EQUAL BENEFIT TO HER CONTRACTUAL RELATIONS WITH BEST WESTERN BECAUSE OF HER RACE UNDER 42 U.S.C.S. §1981

49. Plaintiff repeats and realleges all of the aforementioned allegations.

50. Plaintiff is a 62 year old African American woman who purchased eleven nights in a room at Best Western Hotel.

51. She is a member of a protected class.

52. She had a contractual relationship with Best Western in that she paid money to occupy, use, and have access to a room and all the services the Best Western Hotel offered other patrons, for eleven nights- and Best Western agreed to provide her such access and services in return for said money.

53. Best Western accepted plaintiff's money as consideration for her right to access and utilize her room, and agreed to let her utilize and access the same.

54. Plaintiff appeared at Best Western Hotel on January 12, 2012 and requested hotel intervention to gain access to her room and have her sister removed, after her sister appeared uninvited and became violent with the plaintiff.

55. Plaintiff exited the room and requested hotel staff to intervene and to encourage plaintiff's sister to leave the premises, since plaintiff was a paying patron of the hotel and had purchased the room known as room 301 from January 10, 2012 to January 21, 2012 with her credit card.

56. Plaintiff advised hotel personnel that she was the lawful occupant of room 301.

57. Hotel personnel refused to assist plaintiff in gaining access to her room, ignored her, and refused to request plaintiff's sister leave plaintiff's hotel room. Plaintiff called the police, whose egregious actions on January 12, 2012 are set forth above.

58. However, similarly situated individuals who were caucasion were given preferential treatment to plaintiff, in that hotel employees courteously addressed the concerns of white patrons, assisted them promptly in getting access to their room, and never ignored them the way Best Western employees ignored the plaintiff. In essence, the white patrons of Best Western were never denied access to their rooms or denied services; while the African American plaintiff was completely denied access and services.

59. Subsequent to plaintiff's detainment by police and her release from the mental hospital that police had her involuntarily committed to, plaintiff tried to return to her room to contact her father- who was inside of the room with her brother.

60. Plaintiff was denied access to her room on multiple occasions and called a "trespassing nigger" by a hotel employee at the main desk, who claimed his name was Tye, and told plaintiff she was not allowed inside the hotel because she was trespassing.

61. When plaintiff demanded "Tye" look up on his computer who paid for the room to verify she was lawfully on the premises, Tye refused and continued to make racially disparaging comments to the plaintiff.

62. When plaintiff tried to contact her father in the room she had paid for, by calling the front desk and requesting her call be connected to room 301 (the room she paid for), her request was denied and hotel personnel disconnected the call.

63. Plaintiff is entitled to equal protection of the laws and to enjoy the same privileges that white patrons of the Best Western Hotel enjoy; to wit, access to the rooms and services that they pay for.

64. Best Western Hotel is a place of public accommodation under New York Executive Law Section 296(9), which defines hotels as places of public accommodation.

65. Best Western failed to comply with New York Executive Law, which indicates that it shall be an unlawful discriminatory practice for ay person, being the owner lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation to refuse, withhold from, or deny any of the accommodations, advantages, facilities or privileges thereof (directly or indirectly), because of a person's race.

66. Plaintiff was denied full and equal accommodation when she was deprived of access to the room she paid for, and contact with family members within that room, on the basis of her race, and forced to endure racially disparaging commentary by a hotel employee.

67. Defendant Best Western and their employee, Tye, knew plaintiff had paid for above room since her credit card purchase was documented on their computer and they willfully and maliciously denied her access and contact with the room she had purchased out of racial animus.

68. Plaintiff complained to management about Tye's racially discriminatory comments, preferential treatment for white customers at the expense of the African American plaintiff, his denial of contracted for accommodations and

services, and his racially derogatory comments referencing plaintiff as a "nigger."

69. Tye was an agent and employee of Best Western and his discriminatory conduct in denying plaintiff accommodations and contracted for services because of her race, and using racially disparaging commentary directed at plaintiff, was malicious and with evil intent aimed at harming plaintiff.

70. At the very least, Tye acted with reckless indifference to plaintiff's federally protected rights to equal treatment in contractual relations under 42 USCS Section 1981.

71. Despite complaints to management about the racially discriminatory practices and behaviors going on at Best Western, Defendant Best Western intended to harm plaintiff, acted with malice, and evidenced serious disregard for the discriminatory actions of its agents/employees by failing to take corrective measures to stop racial discrimination at Best Western.

72. Upon information and belief, no disciplinary measures were taken to address Tye's racially discriminatory behavior or correct it, and Best Western, therefore, ratified its employee's misconduct by evidencing a reckless disregard for plaintiff's ordeal.

73. Similarly, Best Western intended to hurt plaintiff by management failing to correct, discipline, reprimand or even investigate its employees' (Tye) discriminatory conduct.

74. The above discriminatory conduct concerned the making, performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

75. Defendants treated plaintiff less favorably with regard to the discriminatory act than the defendant treated other similarly situated persons who were outside plaintiff's protected class.

76. Specifically, white patrons of the hotel who had contracted for access to rooms and services at Best Western were not subjected to the same harsh treatment, with regard to the enforcement of a contract for access to their rooms and services as the African American plaintiff.

77. At no point in time did Tye show animus against whites like he did the African American plaintiff.

78. Tye addressed the white patrons' concerns, helped them get access to their rooms, acted courteously, and never called them racially derogatory names- like the way he did with the African American plaintiff.

79. Plaintiff was denied the contractual benefit of her agreement with Best Western because of defendant's racial animus against plaintiff.

80. Best Western employee, Tye, engaged in the above discriminatory commentary and conduct while acting the scope of normal course of business and while the particular employee was conducting normal duties at the front desk of the hotel.

81. Defendant's denial of her hotel room by Tye and the acquiescence of management in this refusal (despite plaintiff's complaints to management

about discrimination) was both a direct and indirect unlawful discriminatory practice by a manager, agent and employee of Best Western in a place of public accommodation because of plaintiff's race. As such, defendants denied, refused and withheld from plaintiff any of the accommodations, advantages, facilities and privileges thereof.

82. Defendants have impinged on plaintiff's constitutional rights under 42 USCS Section 1981, by denying her occupancy and services, because of her race, after she contracted for the same.

83. As a result, plaintiff suffered injury in the form of emotional anguish, anxiety, severe distress, shame and embarrassment as a result of the defendant's conduct.

84. Plaintiff demands trial by jury.

WHEREFORE, on the first cause of action plaintiff seeks $10 million in emotional damages; $20,000 compensatory damages, and $10 million in punitive damages for defendants malicious conduct; on the second cause of action plaintiff seeks $10 million emotional damages and $10 million punitive damages and $20,000 compensatory damages; on the third cause of action plaintiff seeks compensatory damages in the amount of $15,000, emotional damages in the amount of $10 million, and punitive damages in the amount of $10 million.

Dated: August 14, 2013

Tamara M. Harris
The Law Office of Tamara M. Harris
350 Broadway, Ste 400
New York, New York 10013
(212) 334-1050

## VERIFICATION

I, Wilma Clark, depose and swear under penalty of perjury that I have read the foregoing Verified Complaint and that the facts contained therein are true to the best of my knowledge.

*[signature]*
Wilma Clark

Sworn to before me this 15th day of August 2013

*[signature]*
NOTARY PUBLIC
SAI WING LAU
Notary Public, State of New York
Qualified in Kings County
No. 01LA6155296
My Commission Expires 11-05-2014

Notarizing for the Amended Verified Complaint between Wilma Clark and City of New York. Police Department (15 pages).